## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | **:** | |
| **YASSIN HAYTHAME MOHAMAD,** | **:** | **CIVIL ACTION** |
| **Plaintiff,** | **:** | |
| | **:** | |
| **v.** | **:** | **No. 13-3702** |
| | **:** | |
| **MICHAEL WENEROWICZ,** | **:** | |
| **THOMAS BOLTON, ERIC** | **:** | |
| **VEROSKY, JAMES SPAGNOLETTI,** | **:** | |
| **SHANNON BENNETT, and** | **:** | |
| **CAMERON FLAGG,** | **:** | |
| **Defendants.** | | |

## M E M O R A N D U M

**Stengel, J.**                                                                                      **June 30, 2014**

Yassin Haythame Mohamad brings this § 1983 prisoner civil rights suit against staff members of the Pennsylvania Department of Corrections for alleged violations of his First, Eighth, and Fourteenth Amendment rights. The violations stem from an incident on October 2, 2012 during which the plaintiff was restrained as part of a fire drill and search of Graterford Prison. The defendants move to dismiss the claim for procedural and substantive reasons. I will grant their motion and dismiss the plaintiff's action in its entirety.

### I.        BACKGROUND[1]

####         a.  Plaintiff's Allegations of Civil Rights Violations

---

[1] All facts are taken from the Complaint, Doc. No. 3, unless otherwise noted.

1

Plaintiff Yassin Haythame Mohamad is a restricted release inmate at the State Correctional Institution at Graterford. On October 2, 2012, he had signed-up for daily exercise, was taken to an exercise yard, and was placed in a single cage for his daily exercise. This yard was a part of a restricted housing unit on the J Block where death row inmates were housed.[2] It was cold and raining.

About a half hour later, several corrections officers and members of the Corrections Emergency Response Team (CERT), including Sgt. Bennett, came out to the yard and placed plastic handcuffs on the inmates. The plaintiff claims that Lt. Verosky said he had to be placed in metal handcuffs. The plaintiff allegedly told the officers that he had a bullet in his arm and asked how long he'd be handcuffed.[3] Corrections Officer Flagg allegedly told him that he would be in handcuffs for a few minutes.[4]

Corrections Officers brought inmates from J Block out to the yard and placed them in handcuffs. After about a half hour, the plaintiff then allegedly told Unit Manager Bolton that he had pain in his arm and leg because he suffered from DVT and blood clots.[5] He allegedly told Bolton he could not stand for a long time. Bolton allegedly told the plaintiff "he's not in control."[6] The plaintiff "yelled at him to get medical [treatment]"

---

[2] See Defendants' Motion to Dismiss, Doc. No. 16 at 4; Compl., Doc. No. 3 at 3.

[3] This information was not contained in the plaintiff's grievance. See Compl., Doc. No. 3, Ex. A.

[4] This information was not contained in the plaintiff's grievance. See id.

[5] I'm assuming the plaintiff is referring to Deep Vein Thrombosis in stating he has DVT. He does not define DVT in the complaint.

[6] This information was not contained in the plaintiff's grievance. See id.

but he allegedly ignored his request.[7] The plaintiff also claims that he asked for a coat.[8] He allegedly told Corrections Officer (C.O.) Flagg about his medical condition; Flagg told him to file a grievance.[9]

The plaintiff claims that other non-death row inmates were taken into J Block while he was left handcuffed in the yard. After an hour had passed, plaintiff needed to urinate but was allegedly told to hold it. He claims he urinated on himself.[10] The plaintiff told Lt. Verosky that he was in pain. Lt. Verosky told him to sit down. The plaintiff claims he was unable to sit because the yard was flooded from the rain. He also claims that his weight would have made sitting prohibitive.[11]

After two hours, the plaintiff claims that Sgt. Bennett and Capt. Campbell came out to the yard with coats but did not give him one. He claims that Lt. Verosky and another corrections officer ordered him to undress but he refused to do so.[12] After that,

---

[7] This information was not contained in the plaintiff's grievance. See id.

[8] This information was not contained in the plaintiff's grievance. See id.

[9] In his grievance, the person who the plaintiff alerted was an unidentified Chester CERT staff member. From what the denial states, it appears that C.O. Flagg was the unidentified Chester CERT staff member who spoke with the plaintiff. See Compl., Doc. No. 3, Ex. A.

[10] In his complaint, he claims other inmates also urinated themselves; however, this information was not in his initial grievance. See Compl., Doc No. 3 at 3 and Ex. A.

[11] The complaint states that the plaintiff is 265 pounds. Compl., Doc. No. 3 at 3. The plaintiff states in his grievance appeal documents that he is 5' 6". See id., Ex. A (Grievance and Denials).

[12] In his grievance, the plaintiff also claimed that the "Lt. Verosky & other guards was [sic] laughing & making fun of [him]" when he was eventually taken inside. See Compl., Doc No. 3, Ex. A. This claim was not in his complaint.

the plaintiff was taken into J Block where he asked for medical attention which was denied. After his cell was searched, the plaintiff was placed into in his cell.[13]

The plaintiff claims he sustained several injuries as a result of being kept in handcuffs for over two hours.[14] He allegedly sustained bruises to his wrists and swelling in his hand because the handcuffs were too tight and not double-locked. His right arm, the one in which the bullet was lodged, also "cramped up." He also experienced soreness in his shoulders. The leg in which he had DVT and blood clots also allegedly swelled up, causing numbness and making it difficult for him to walk. The plaintiff requested medical treatment yet claims he did not receive it until after he filed a grievance. Eventually, he was given Tylenol for his wrist and X-rays of his wrists were taken. He claims he never received the results of those X-rays. In addition, the bullet in the plaintiff's arm has allegedly travelled down into his elbow so that it is now "protruding."

The plaintiff also claims that he experienced psychological trauma from the incident. He claims that his psychologists encouraged him to file grievances for these various injuries.[15] Lastly, the plaintiff—a Sunni Muslim—alleges he was also unable to offer prayer as dictated by his religion, as a result of his handcuffing,.[16]

---

[13] In his grievance, the plaintiff also claimed that he was left in handcuffed for 15 minutes more than the other inmates. See Compl., Doc No. 3, Ex. A.

[14] The plaintiff's grievance claims he was in the yard for three and a half hours, from 8:30 a.m. to 1 p.m. See id. His description of events indicates that he was in the yard for an hour and a half before the fire drill and handcuffing began.

[15] In his grievance, he equated the experience to "being treated like the African slaves that was awaiting transfer to a white plantation," to that of "detained prisoner of war," and/or to an "act of terrorism." See Compl., Doc No. 3 at 3 and Ex. A.

[16] This information was contained in his grievance and not in his complaint. See Compl., Doc No. 3 at 3 and Ex. A.

### b.  Plaintiff's Grievance Filings

On October 5, 2012, the plaintiff filed a grievance with the Facility Grievance Coordinator.[17] As part of his grievance, he asked that the videotapes from the date of the incident be preserved and that the other inmates involved be interviewed on videotape.[18] In addition to the incidents described above, the plaintiff claimed that he had been retaliated against since he filed his grievance, with threats that he would be transferred.[19]

On November 13, 2012, the grievance was denied as "frivolous."[20] The denial indicates that on October 2, 2012, SCI Graterford's Fire Safety Department conducted a fire drill on the J Block and used the exercise yard as an evacuation area. At the conclusion of the drill, an authorized general search of the J Block began. The search was authorized because the staff had information that inmates on that block had several serious contraband items that might put the safety of the staff and inmates at risk.[21] The

---

[17] The plaintiff alleges that he "complained to Superintendent Wenerowicz" and to Capt. Spagnoletti, the security captain. It is unclear what he means by these statements. I can only assume from the attachments to his complaint that the October 5, 2012 grievance was the complaint of which he speaks since he offers no details about the filing of other complaints.

In his grievance, the plaintiff also claimed that he contacted President Barack Obama, Governor Corbett, the "HRC" (I'm assuming this is the Human Rights Commission), the ACLU, the Human Prisoner Rights Coalition, Major Fields, Attorney General Holder, Psychologist Whitfield, Dr. Blott, Nurse Paul, Superintendent Wenerowicz, and Deputy Lane before he filed his grievance. See Compl., Doc. No. 3, Ex. A.

[18] See Compl., Doc. No. 3, Ex. A (Grievance and Denials).

[19] The plaintiff was later transferred to SCI Coal Township on July 31, 2013, according to a motion to cease retaliation he filed after this suit commenced. See Doc. No. 12. Why he was transferred is unclear but the timing of the transfer, some ten months later, makes it difficult to say that it was in retaliation for the filing of his grievance.

[20] See id.

[21] The denial states that this was "the first Level 5 Housing Unit general search that was completed without a use of force being utilized and a serious contraband weapon being recovered." The denial indicates that the search was carried out to ensure no inmates had weapons that could hurt staff or inmates, given that there had been several other serious contraband weapons recovered on this Unit and that there was an indication that other weapons may be on the unit. Id.

denial states that the prisoners, including the plaintiff, were restrained for their own safety.

In the denial, Lt. Verosky reported that the plaintiff asked not to be placed in plastic cuffs because of a medical condition. As a result, the plaintiff reportedly was placed in two sets of metal handcuffs with double locks.  Lt. Verosky reported that the plaintiff did complain about the handcuffs being too tight and that they were readjusted as a result. According to the denial, Sgt. Bennett was not in the area while the plaintiff was being restrained and only came out when coats were being distributed to all the inmates.

The grievance denial indicated that the yard had an overhead covering which would have prevented the plaintiff from getting wet in the rain. It stated that the inmates were not prevented from sitting during the drill. The denial reported that no staff members asked that the plaintiff submit to a strip search and that the plaintiff's restraints were removed at the same time as the other prisoners.[22]

In response to his First Amendment claim, the denial indicates that SCI Graterford's Islamic worship leader, Imam Tahir Aderonmu, reported that prayer was held at 5:30 a.m. and noon—times during which the denial states the plaintiff was not being restrained. The denial also states that the plaintiff was seen by Nurse Practitioner K. Tobin during sick call rounds and by the medication nurse when he received his daily medication on October 2, 2014.

---

[22] The denial also indicates that Lt. Verosky was not present when the plaintiff was being un-cuffed and/or returned to his cell.

On January 10, 2013, the plaintiff appealed the grievance response to Superintendent Wenerowicz, who denied the appeal on February 4, 2013.[23] Wenerowicz deemed the appeal "frivolous" as well and found that the issues raised in his grievance had already been adequately addressed by his previous denial.[24] Wenerowicz also stated that he had reviewed the videotape of the fire drill/search and found no policy violations.[25] Lastly, Wenerowicz indicates that the plaintiff's medical records show he was evaluated but no injuries were found; he was "directed to follow up with sick call, if needed."[26]

On February 26, 2013, the plaintiff then appealed to Chief Grievance Officer Dorina Varner.[27] In this appeal, he again claimed that the previous denials were flawed because they were based on fabrication by Lt. Verosky.[28] He further offered DC ADM 6.5.1 & 6.3.1 as evidence that there was not a fire drill because those policies state that the entire building must be evacuated during a fire drill, yet only the "entire death row

---

[23] In this appeal, the plaintiff stated the following were errors in his denial: 1) Unit Manager Terra totally relied on Lt. Verosky's testimony which was false regarding the readjustment of his handcuffs; 2) Sgt. Bennett was in the yard when he was being restrained; 3) the rain was blowing so the overhang was not helpful; 4) he was never given a coat; 5) there was no actual fire drill since all the death row inmates were brought to the yard; and 5) that it was all a "strategic conspiracy plant to search death row inmates and only [the plaintiff]."

[24] See Compl., Doc No. 3, Ex. A (Grievance and Denials).

[25] Id.

[26] Wenerowicz also noted that there was no violation in the use of flex cuffs. He did not speak directly to the plaintiff's contention of his *metal* handcuffs being too tight. He also indicated that the prison officials had no control over the weather. See id. In his final grievance appeal, the plaintiff noted this point as showing Wenerowicz's lack of attention in reviewing his denial. Id.

[27] Id.

[28] He also reiterated that Sgt. Bennett was in the yard, despite what the grievance response said. He claimed that she was involved in breaking up a fight between two death row inmates. See id.

population & only a few inmates on F-wing" were evacuated.[29] He indicated that the fire drill was really just a "false call to get the entire death row population out [of] their cells to search chosen people."[30] The plaintiff further explained that inmates on the F, E, D, and C blocks were searched later in the day on October 2, 2014 through the use of drug sniffing dogs. He claimed that during the morning search related to the fire drill, he was the only prisoner from these blocks searched.[31] In this appeal, the plaintiff stated that he was now being treated for the "protrusion" in his arm with pain and nerve medications.[32] Varner dismissed his final appeal as untimely.[33]

### c.  Plaintiff's § 1983 Action

On June 14, 2013, the plaintiff filed this *pro se* complaint against Superintendent Wenerowicz, Capt. Spagnoletti, C.O. Verosky, Sgt. Bennett, Unit Manager Bolton and C.O. Flagg, individually and in their official capacities, under 42 U.S.C. § 1983.[34] His claims include violations of the First, Eighth, and Fourteenth Amendments. The plaintiff is seeking proper medical care for his blood clots, wrists, and mental anguish, along with

---

[29] Id.

[30] Id. The plaintiff also added in this appeal that he had experienced a severe cold from being in the rain with no coat. This was a fact not previously mentioned nor one offered in his complaint. See id.

[31] See id.

[32] The plaintiff was put on Ultram and Nervoxin, according to his appeal. See id.

[33] The appeal was dated February 26, 2014 but postmarked March 5, 2013. See Defendants' Motion to Dismiss, Ex. A.

[34] The plaintiff's grievance named Lt. Verosky and Sgt. Bennett, but not Spagnoletti or Flagg. The grievance stated that Bolton was present and observed the incidents but did not carry out the actions the plaintiff states Bolton did in his federal complaint. He also had named C.O. Butts, Lt. Shover, and the Graterford and Chester CERT as staff that violated his rights in his grievance complaint.

fees, costs, and damages related to his pain and suffering.[35] He requested that an attorney be appointed.[36] I previously granted this request and ordered that his complaint be made available to the Civil Rights Panel of volunteer attorneys.[37] No attorney has taken the plaintiff's case and he continues to be *pro se*.[38] The defendants move to dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

## II.    STANDARD OF REVIEW

### a.  Rule 12(b)(1)

Rule 12(b)(1) allows a court to dismiss a complaint based on a lack of subject-matter jurisdiction. FED. R. CIV. P. 12(b)(1). A Rule 12(b)(1) motion is the proper mechanism for raising the issue of whether Eleventh Amendment immunity bars federal jurisdiction. Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 694 n. 2 (3d Cir.1996), citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98-100 (1984) (Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction).

### b.  Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the legal

---

[35] In his grievance, the plaintiff stated he wished to be compensated for every hour he was restrained and that he be given "$1 million dollars for the physical and mental abuse [he] had to endure."

[36] See Doc. No. 6.

[37] See Doc. No. 8.

[38] See Doc. No. 18 and 19.

sufficiency of the complaint.[39] Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The factual

allegations must be sufficient to make the claim for relief more than just speculative.

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). In determining whether to

grant a motion to dismiss, a federal court must construe the complaint liberally, accept all

factual allegations in the complaint as true, and draw all reasonable inferences in favor of

the plaintiff. Id.; see also D.P. Enters. v. Bucks County Cmty. Coll., 725 F.2d 943, 944

(3d Cir. 1984).

      The Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all

of the facts upon which he bases his claim. Conley, 355 U.S. at 47. Rather, the Rules

require a "short and plain statement" of the claim that will give the defendant fair notice

of the plaintiff's claim and the grounds upon which it rests. Id. The "complaint must

allege facts suggestive of [the proscribed] conduct." Twombly, 550 U.S. at 564. Neither

"bald assertions" nor "vague and conclusory allegations" are accepted as true. See Morse

v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997); Sterling v. Southeastern

Pennsylvania Transp. Auth., 897 F. Supp. 893 (E.D. Pa. 1995). The claim must contain

enough factual matters to suggest the required elements of the claim or to "raise a

reasonable expectation that discovery will reveal evidence of" those elements.  Phillips v.

County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 550 U.S. at

556).

---

[39] In deciding a motion to dismiss, the court should consider the allegations in the complaint, exhibits attached to the
complaint, and matters of public record. See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d
1192, 1196 (3d Cir. 1993).  The court may also consider "undisputedly authentic" documents when the plaintiff's
claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss.
Id.

A court "may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Brown v. Card Service Center, 464 F.3d 450, 456 (3d Cir. 2006)(quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

## III.   DISCUSSION[40]

### a.   Eleventh Amendment Bars Suit Against Defendants in Their Official Capacities

The defendants argue that the plaintiff's claims against the defendants in their official capacities are barred by the Eleventh Amendment. The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Courts have interpreted this amendment to provide states immunity from lawsuits brought by private parties seeking monetary damages. See, e.g., Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267-270 (1997); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996). "The eleventh amendment bar extends to suits against departments or agencies that have no existence apart from the state." Laskaris v. Thornburgh, 661 F. 2d 23, 25 (3d Cir. 1981). "This bar remains in effect when State officials are sued for damages in their official capacity [because] 'a judgment against a public servant in his official capacity imposes liability on the entity that he represents….'" Kentucky v. Graham, 473 U.S. 159,

---

[40] Jurisdiction is based upon a federal question under 28 U.S.C. §1331. Venue is appropriate because the alleged violations took place at Graterford, which is within this district.

169 (1985)(quoting Brandon v. Holt, 469 U.S. 464, 471 (1985))(quotation marks and citations omitted).

The Pennsylvania's Department of Corrections is an executive department of the Commonwealth, meaning it cannot exist apart from the State. 71 P.S. §732-102; see Lavia v. Commonwealth of Pennsylvania, et al., 224 F. 3d 190, 195 (3d Cir. 2000). As such, the DOC and its officers in their official capacities would be immune from lawsuits for damages, unless some exception exists.

The Eleventh Amendment bar can only be overcome if a State waives this immunity or Congress has abrogated the States' immunity using a valid exercise of power. Graham, 473 U.S. at 169 ("[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court.")(citations omitted).[41] Pennsylvania has not waived its immunity to be sued under § 1983. 42 Pa. C.S. § 8521(b); Laskaris, 661 F. 2d at 25. In enacting §1983, Congress did not abrogate the State's immunity under the Eleventh Amendment. Quern v. Jordan, 440 U.S. 332, 341-42 (1979). Therefore, no exception exists to overcome the Eleventh Amendment bar.

The defendants cannot be sued in their official capacities, only in their individual capacities. In addition to Eleventh Amendment immunity, the Commonwealth defendants in their official capacities are not considered "persons" amenable to suit for damages under § 1983. Will v. Michigan Dept. of State Police, 491 U.S. 58, 69-71 & n.10

---

[41] See also Lavia, 224 F. 3d at 195 ("Such immunity, however, may be lost in one of two ways: (1) if the Commonwealth waived its immunity; or (2) if Congress abrogated the States' immunity pursuant to a valid exercise of its power.").

(1989)("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."). The claims for damages against the defendants in their official capacities are dismissed.[42]

### b. Exhaustion of Administrative Remedies

The defendants next argue that the plaintiff's lawsuit should be dismissed because he did not properly exhaust the administrative remedies available to him. The Prison Litigation Reform Act (PLRA) requires prisoners to exhaust available administrative remedies before bringing legal action in federal court for civil rights violations.[43] "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).[44]

In order to bring suit in federal court, a prisoner must not only exhaust his administrative remedies using the prison's grievance procedure but must also do so "properly." Woodford v. Ngo, 548 U.S. 81, 90 (2006); Spruill v. Gillis, 372 F.3d 218,

---

[42] See Laskaris, 661 F. 2d at 26 ("Thus, for purposes of the eleventh amendment the suit is against the officer as an individual, although his action is still 'state action' for purposes of s 1983 and the fourteenth amendment."(citing Quern v. Jordan, 440 U.S. 332 (1979)).

[43] The Prison Litigation Reform Act (PLRA), 42 U.S.C. §1997e(a), provides: "No action shall be brought with respect to prison conditions under section 1983 of this title by a prisoner confined in jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

[44] See also Booth v. Churner, 532 U.S. 731, 741 (2001)("Thus, we think that Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures."); Woodford v. Ngo, 548 U.S. 81, 84 (2006)("Exhaustion is no longer left to the discretion of the district court, but is mandatory.").

230 (3d Cir. 2004).[45] "[T]he determination [of] whether a prisoner has 'properly' exhausted a claim (for procedural default purposes) is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances, and the waiver, if any, of such regulations by prison officials."[46] Spruill, 372 F.3d at 222. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Woodford, 548 U.S. at 90-91.

Like all Pennsylvania state correctional institutions, Graterford had a grievance procedure in place under DC-ADM 804 which provided three levels of review: 1) initial review by the facility grievance coordinator; 2) appeal from the initial review to the Superintendent or Regional Director; and 3) final appeal to the Chief Hearing Examiner.[47] Appeals from one level to next must be filed within fifteen working days of

---

[45] In Spruill, the Third Circuit decided whether a prisoner had to simply go through the prescribed grievance procedure or whether the prisoner had to do so properly. 372 F.3d at 228. In making its decision, the Third Circuit found that Congress intended for the exhaustion requirement in § 1997e(a) to include a procedural default. Id. at 230.

[46] In Spruill, courts were instructed to "recognize prisoners' procedural defaults within the applicable prison grievance system" so long as that grievance procedure was deemed "adequate" and did not violate the Constitution. Id. at 231-32. The Pennsylvania Department of Corrections grievance procedure, DC-ADM 804, has been deemed an adequate administrative remedy for the purposes of the PLRA by the Third Circuit. See Booth v. Churner, 206 F.3d 289, 292 n. 2, 300 (3d Cir. 2000), aff'd, 532 U.S. 731 (2001)(explaining the three-step grievance process in Pennsylvania prisons and holding that under this procedure exhaustion was required); Spruill, 372 F.3d at 232.

The Supreme Court adopted similar reasoning in Woodford, 548 U.S. at 92-97.

[47] See Spruill, 372 F.3d at 232.

an administrative decision.[48] Exhaustion of this administrative procedure requires a prisoner to present his claims at each level.[49]

The plaintiff alleges that he exhausted his remedies and attaches grievance No. 431064 to his complaint as proof. The defendants argue that the plaintiff failed to comply with the administrative grievance procedure by timely filing his appeals. The facts presented do not clearly establish that the plaintiff's appeals were untimely.

The denial of the plaintiff's timely-filed initial grievance was dated November 13, 2012. However, the date stamp at the bottom on the denial submitted by the plaintiff indicates it was not received until December 24th. Why there was over a month lag in his receipt of the denial is unclear; the plaintiff does not address this point in his complaint. The plaintiff then filed his appeal of this denial on January 10, 2013. Without noting the date stamp, it would appear that the plaintiff's appeal was untimely.

However, viewing this fact in the light most favorable to the plaintiff, it would appear that his appeal was timely, under the circumstances.[50] He had fifteen (15) working

---

[48] DC-ADM 804 defines "working days" as Monday through Friday, excluding state holidays. See DC-ADM 804, Inmate Grievance System Policy, Glossary of Terms, available at http://www.cor.state.pa.us/portal/server.pt/community/doc_policies/20643. I will note that the version of the policy available became effective on May 2, 2014; however, the defendants' motion to dismiss argues that the 15-day deadline was in effect when the plaintiff's grievance was filed and case law indicates that the 15 working-day deadline had previously been in effect. See Defendants' Motion to Dismiss, Doc. No. 14. See, e.g., Armstrong v. Folino, No. 06-164, 2007 WL 710281, at *6 (W.D.Pa. Mar. 6, 2007); Kittrell v. Watson, 2014 WL 1304713, at *5, --- A.3d ---- (Pa. Commw. Ct. Apr. 2, 2014).

[49] See id.

[50] DC-ADM 804 starts the fifteen-day clock from the date of the denial. See DC-ADM 804 at 2-1. However, if the plaintiff did not receive the denial until a month after that date, it would not fair to keep him to this deadline since he needs notice of the denial and its contents in order to appeal.

days to file his appeal, making it due January 16, 2013.[51] He filed his appeal on January

10, 2013, before the deadline. Superintendent Wenerowicz considered the plaintiff's

appeal, addressed his issues, and made a decision to uphold the initial denial on the

merits. Wenerowicz did not indicate that the appeal was untimely in his decision.

Wenerowicz's decision was dated February 4, 2013. The plaintiff had fifteen (15)

working days to submit an appeal, which would have made his deadline February 26,

2013. The record shows that the appeal was dated February 26, 2013 but was postmarked

March 5, 2013.[52] It was received by the Secretary of Inmate Grievances and Appeals on

March 7, 2013. As a result, the plaintiff's submission at the third level of review was

denied as untimely.

The postmark date is not necessarily the filing date. The date on which the

plaintiff deposited the appeal in the institutional mailbox would have been the date on

which it was filed. Kittrell v. Watson, 2014 WL 1304713, at *6, --- A.3d ---- (Pa.

Commw. Ct. Apr. 2, 2014).[53] The plaintiff does not provide the date on which he

deposited the appeal in the prisoner mailbox. But he does contend in his complaint that he

---

[51] By my count, there likely would have been at least two state holidays—Christmas and New Year's Day—between December 24, 2012 and January 14, 2013, which is fifteen working days after December 24, 2012. This would extend the deadline by two more days, to January 16, 2013.

[52] See Defendants' Motion to Dismiss, Doc. No. 14, Ex. A.

[53] In Kittrell, the Pennsylvania Commonwealth Court found that the prisoner mailbox rule—that "a prisoner's pro se appeal is deemed filed at the time it is given to prison"—applied to the DOC's grievance process. 2014 WL 1304713 at *6. The court found that the trial court erred in dismissing a prisoner civil rights complaint for failure to exhaust administrative remedies because the prisoner's appeal was deemed untimely. Id. at *7. The prisoner claimed he had deposited his appeal in the prisoner mailbox the same day it was dated, despite the fact that the postmark on the envelope was for one month later. Id. at *2. The matter was remanded to the trial court to consider whether the pro se prisoner had placed the appeal in the mailbox as he stated, thereby filing the appeal under the prisoner mailbox rule. Id. at *7.

filed the appeal timely. At this stage, I am required the construe the facts in the light most favorable to the plaintiff. For this reason, I cannot dismiss the plaintiff's complaint based solely on the defendants' argument that he did not timely appeal his grievance denial and properly exhaust his administrative remedies.[54]

### c.  Merits of Plaintiff's Claims

#### 1.  Claims Against Wenerowicz and Spagnoletti as Supervisors

The defendants argue that the claims against Superintendent Wenerowicz and Captain Spagnoletti in their individual capacities fail to state a claim against them. "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005)(quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988))(quotation marks omitted).[55]

---

[54] I recognize that "it is beyond the power of this court—or any other—to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis." Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000). If the plaintiff had offered valid claims, I would have dismissed the complaint granting the plaintiff leave to amend with the date on which he actually deposited the appeal in the prisoner mailbox, to establish if his claims were properly exhausted. See Shane v. Fauver, 213 F.3d 113, 117 (3d Cir. 2000). However, given that the facts he has already provided afford him no legal remedy—as I will explain below—I find no reason to dismiss and allow for the plaintiff's amendment, when such an amendment appears it would be futile. Id. My dismissing the complaint with leave to amend, in order to determine the date on which he actually deposited the appeal, would unnecessarily expend further resources and time on the part of the parties.

The plaintiff's complaint and the attached grievances provide substantial detail about the events he claims violated his Constitutional rights. The plaintiff's allegations are not factually deficient but instead are legally deficient.

[55] See also Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.").

The plaintiff does not allege that Wenerowicz and Spagnoletti were personally involved in his alleged Constitutional violations nor does he offer any facts which would support a Constitutional violation on the part of Wenerowicz or Spagnoletti.[56] He names them in the complaint because they are supervisors of the other defendants he has named.[57] This supervisory relationship alone is not enough to show that Wenerowicz and Spagnoletti are liable under § 1983.[58] The claims against them in their individual capacity are dismissed based on the facts the plaintiff has presented.[59]

---

[56] See id. ("Because vicarious liability is inapplicable to…§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

[57] The only mention of Wenerowicz and Spagnoletti in the plaintiff's complaint was the statement: "I complained to Supt. Wenerowicz who done nothing & he's their overseer & Capt. Sagnoletti is/or was the Security Captain & should be held responsible."

[58] The only other possible way I can assume the plaintiff might be trying to implicate these defendants is in implying that they violated his procedural due process rights by not properly reviewing or investigating his grievance complaints. Even if I were to liberally construe the plaintiff's allegations—as I am required to do for *pro se* plaintiffs—it would be a stretch to say that a procedural due process claim can be brought against them. See Haines v. Kerner, 404 U.S. 519 (1972).The plaintiff offers no facts in his complaint to show that he was not given proper process during the grievance review procedure by either of these defendants. For this reason, I cannot begin to know what actions undertaken by these defendants would constitute a civil rights violation. Even under a procedural due process theory, the plaintiff's claims against Wenerowicz and Spagnoletti fail.

The plaintiff also does not mention them in his grievances. If he intended to bring any other claims against them related to his alleged First or Eighth Amendment violations, those claims would be considered procedurally defaulted since they were not raised during the grievance process. See, e.g., McClain, Jr. v. Alveriaz, No. 07-5551, 2009 WL 3467836, at *11 (E.D.Pa. Oct. 26, 2009)("Because Plaintiff's time limit for exhausting his administrative remedies has long since expired, his claims are rendered procedurally defaulted."); Potter v. Deputy Attorneys Under Lynn Abreham, No. 03-04735, 2008 WL 375106, at *8 (E.D.Pa. Feb. 11, 2008)("Due to Plaintiff's failure to exhaust, this court does not have jurisdiction to determine Plaintiff's claims as to their factual merit.").

[59] See, e.g., Harper v. Albo, No. 10–7555, 2011 WL 3740815 (E.D.Pa. Aug. 24, 2011)(dismissing complaint against defendant for lack of "personal involvement or knowledge of the events underlying the allegations"); Carrasquillo v. Rendell, C.A. No. 09–347, 2009 WL 1940394, at *3 (W.D.Pa. June 30, 2009) (dismissing several defendants because "[t]he allegations of the complaint never specifically mention actions taken on the part of [those defendants]. This alone is sufficient to dismiss the complaint against them"); Richardson v. Deutsche Bank Trust Co., No. 3:08–CV–1857, 2008 WL 5225824, at *3 (M.D.Pa. Dec.12, 2008)("[S]ince there is a complete absence of allegations against any of the Individual Defendants named in Plaintiff's complaint, the Court finds that this complaint is so undeveloped that it does not provide these Defendants the type of notice of claim which is contemplated by Rule 8.").

### 2.  Plaintiff's First Amendment Claim

The plaintiff claims his First Amendment rights were violated because his being restrained on October 2, 2012 prevented him from offering prayer as a Sunni Muslim. The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. CONST. amend. I. Even viewing the facts in the light most favorable to the plaintiff, I cannot find that plaintiff's inability to offer prayer was enough to warrant a First Amendment violation under § 1983.[60]

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987).[61] Assuming that the plaintiff's religious beliefs as a Sunni Muslim are sincerely held, the prison staff's restraint of the plaintiff on October 2, 2012 was reasonably related to legitimate penological interests—namely inmate and staff

---

[60] The grievance denial states that the plaintiff was not restrained at 5:30 a.m. or 12:00 p.m. when Muslim prayer services were held on October 2, 2012. The plaintiff contends that he was restrained between 8:30 a.m. and 1:00 p.m. Even if the plaintiff had missed the noon prayer time because the fire drill/search ran later than the defendants contended, this would amount to a single deprivation of the plaintiff's religious rights. This single deprivation—which was carried out in order to ensure order, discipline, and safety of the inmates—would not rise to the level of a constitutional violation. See Watkins v. Rogers, 525 Fed.Appx. 756, 759 (10th Cir. 2013)(finding that  the single, isolated incident of a prisoner being refused a meal compliant with his religious beliefs was not enough to amount to a First Amendment violation).

[61] The plaintiff does not allege a violation under the Religious Land Use and Institutionalized Persons Act (RLUIPA), but one might be implied. RLUIPA provides that: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.A. § 2000cc-1.

An RLUIPA claim would also fail based on the facts presented. If the plaintiff had missed a single prayer service because the defendants were conducting a fire drill and/or safety search, this single instance would not be enough to constitute a substantial burden. Even if it were a substantial burden, the defendants had compelling interests— namely the safety of the staff and inmates—for their actions and appeared to carry out those actions in the least restrictive manner (i.e. using plastic cuffs).

safety.[62] For this reason, his inability to pray on a single occasion while a fire drill and search was being conducted would not constitute a violation of his First Amendment rights.[63]

### 3.  Plaintiff's Eighth Amendment Claim

The plaintiff also does not state an Eighth Amendment claim. "[T]o establish an Eighth Amendment violation an inmate must allege both an objective element—that the deprivation was sufficiently serious—and a subjective element—that a prison official

---

[62] The plaintiff claims that the fire drill was a sham and that the prison simply was trying to evacuate everyone in order to search the inmates' cells. Even assuming that the incident on October 2, 2012 was only a search of inmates' cells—as the plaintiff claims—and did not involve an actual fire drill, his claim still fails. The grievance denials indicate that the search of the inmates' cells was conducted for safety purposes. This appears to be the only reasonable inference that can be drawn for the prison staff to conduct this search. It would not make sense for the staff to evacuate the death row inmates—an arduous task which could have potentially unsafe and dire consequences—but for a larger, legitimate safety concern. In addition, the fact that CERT members were involved offers evidence that the incident involved some sort of emergency, whether in the form of a fire drill and/or a necessary search. The details offered by the plaintiff about the incident are very similar to descriptions offered in other cases describing emergency preparedness drills in Pennsylvania prisons. See Long Qun Lin v. Mitchell, No. Civ. 4:CV-05-299, 2007 WL 216327, at *5-6 (M.D. Pa. Jan. 25, 2007); Ostrander v. Horn, 145 F.Supp.2d 614, 617 (M.D. Pa. 2001).

[63] Turner instructs a district court to weigh four factors when determining if prison defendants prevented an inmate's free exercise of religion without a legitimate penological purpose: 1) whether the regulation bears a "valid, rational connection" to a legitimate and neutral governmental objective; 2) whether prisoners have alternative ways to exercise their religious rights; 3) whether accommodating the right would have a deleterious impact on other inmates, guards, and the allocation of prison resources generally; and 4) whether alternatives exist that fully accommodate the prisoner's rights at de minimis cost to valid penological interests. 482 U.S. at 89–91. See also Fraise v. Terhune, 283 F.3d 506, 513–14 (2002). "[A] measure of deference is especially appropriate when a regulation implicates prison security." Fraise, 283 F.3d at 516.

For the sake of thoroughness, I find that the first, third, and fourth factors weigh heavily in favor of there being a legitimate penological interest. The fire drill and search served a legitimate, neutral objective related to ensuring prison security. Accommodating the plaintiff during this drill and search, with all the inmates being detained in the yard, would have had a deleterious impact on order being kept among the inmates under those circumstances. The drill and search would likely not have been able to be properly carried out if the plaintiff were permitted to be un-restrained and attend services at the appropriate time. There appeared to be no reasonable alternative in light of the circumstances to accommodate the plaintiff. The prison staff could have scheduled the drill and search at a different time but there would still be no guarantee as to how long the process would take and whether it would overlap with prayer service times. The second factor weighs in favor of the plaintiff's rights in that he could not necessarily have prayed in the way he wanted to with his arms behind his back. However, this does not appear to be enough to show that his restraint during the fire drill and search violated his First Amendment rights.

acted with a sufficiently culpable state of mind, i.e., deliberate indifference." <u>Nami v. Fauver</u>, 82 F.3d 63, 67 (3d Cir.1996) (citing <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991)).

The facts presented do not show that that plaintiff suffered a "sufficiently serious" injury. Viewing the facts in the light most favorable to the plaintiff, he sustained minor injuries related to his handcuffing during the incident described. These include soreness of shoulders, bruises, and swelling. He also claims he endured psychological trauma because of the incident he describes.[64] None of these injuries appear to be "sufficiently serious."[65]

Though the plaintiff alleges he was not given appropriate medical treatment, he admits that he was prescribed medication for his pain, his wrist was X-rayed, and he received psychological counseling after-the-fact. For this reason, the facts he has presented do not support a claim of inadequate medical care either.[66]

Lastly, the plaintiff claims he was not provided with appropriate clothing or shelter during the incident given the rainy and cold weather conditions. The defendants' rendering of the facts contradicts this point. Even if the plaintiff's rendering were correct, there is nothing to show that the defendants were deliberately indifferent to the cold and

---

[64] The plaintiff also seems to indicate that the request that he be strip searched in the yard was a violation of his rights. The defendants claim he was not asked to undress. Even if the plaintiff was asked to be searched, he did not comply and no further request that he undress was made. Therefore, he suffered no injury. No Constitutional violation could result from this allegation.

[65] He also talks about the movement of the bullet in his arm, causing a protrusion in his elbow. While this injury may be sufficiently serious, there is nothing to show that this movement of the bullet was caused by the incident in question. He also indicated in his complaint that he told the defendants about his bullet in his arm yet they were unresponsive; these same facts were not included in his grievances. Therefore, they would not have been properly exhausted and could not be brought in this suit.

[66] His implied claim for injunctive relief related to his receiving medical treatment for these injuries would also be moot.

21

rainy conditions, which were outside of their control. The inmates were placed in a yard with an overhang to keep dry from the rain. The inmates were also given coats.[67] Both a serious injury and deliberate indifference are necessary to make out an Eighth Amendment claim of cruel and unusual punishment.[68] The plaintiff fails to show that both were present.

For these reasons, I will dismiss the plaintiff's Eighth Amendment claim.[69]

### d. Plaintiff's Allegation of a Procedural Due Process Claim

The plaintiff also claims his rights under the Fourteenth Amendment were violated. Whether the plaintiff is claiming a procedural due process claim or a substantive due process claim is unclear. From the facts presented I can only assume the former is being asserted.[70] I cannot find any violation of the plaintiff's procedural due process rights.[71] The grievance procedure afforded him an adequate opportunity to be heard. See

---

[67] Though the plaintiff claims he was not given a coat, the fact that coats were brought out to the inmates contradicts the idea that the defendants were deliberately indifferent to the plaintiff's lack of appropriate clothing.

[68] See Ostrander v. Horn, 145 F.Supp.2d 614, 619 (M.D. 2001), aff'd 49 Fed. Appx. 391 (3d Cir.2002)("The fact that the plaintiff was handcuffed, removed from his cell, forcefully taken to a temporary holding cell for a short period of time, returned to the RHU, strip-searched and returned to his cell, all in conjunction with the execution of 'an emergency preparedness drill involving an RHU fire-drill evacuation', are not the types of conditions which rise to the level of an Eighth Amendment violation.").

[69] It is not clear what type of Eighth Amendment claim the plaintiff is making. Even if the claim were that the defendants used excessive force in restraining the inmates during the fire drill and search, this force may still have been appropriate given that it was intended to restore order and maintain discipline. See Hudson v. McMillian, 503 U.S. 1, 6 (1992). Under the circumstances presented, the plaintiff's facts also do not appear to support an excessive force claim.

[70] Even viewing the facts in the light most favorable to the plaintiff, I cannot find anything in the allegations to show a substantive due process claim. If one was asserted, it would likely be analyzed under the Eighth Amendment, in accord with the "more specific provision rule." See Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 260 (3d Cir. 2010) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 843-44 (1998)).

[71] The plaintiff also titles his claims as violations of his "8th and 14th Amendment cruel and unusual punishment," making it seem that the plaintiff was attempting to assert an 8th Amendment using the 14th Amendment. See Compl., Doc. No. 1 at 3.

<u>Pettaway v. SCI Albion</u>, Civ. A. 11-158, 2012 WL 366782, at *3 (W.D. February 2, 2012)(citing <u>Tillman v. Lebanon</u> <u>County Corr. Facility</u>, 221 F.3d 410, 422 (3d Cir. 2000)).[72] The procedure also allowed his grievance denial to be reviewed three times before his administrative remedies were exhausted, allowing for any errors to be corrected.

Because the plaintiff fails to make out a due process claim, his Fourteenth Amendment claim will also be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, I will grant the defendants' motion and dismiss the plaintiff's complaint in its entirety.

An appropriate Order follows.

---

[72] <u>See</u> <u>Tillman</u>, 221 F.3d at 422 ("The grievance program allowed prisoners to complain about 'any' matter that is 'unjust,' and as updated, also provided for direct appeal to the warden….In sum, the plaintiff had an adequate postdeprivation remedy, thereby satisfying due process.").